**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF MASSACHUSETTS**
**WESTERN DIVISION**

| | |
|---|---|
| In re:<br><br>MODERN ALUMINUM ANODIZING<br>CORPORATION,<br>           DEBTOR | Chapter 11<br>Case No. 07-40561-HJB |

**TRUSTEE'S**

**COMBINED PLAN OF REORGANIZATION AND DISCLOSURE STATEMENT**

I. INTRODUCTION

    A.  General

       This is the Combined Plan of Reorganization and Disclosure Statement (the "Plan and Disclosure Statement") for Modern Aluminum Anodizing Corporation (the "Debtor"). Portions of the Plan and Disclosure Statement which refer solely to the Plan of Reorganization will be referred to as the "Plan". This Plan and Disclosure Statement contains a description of (1) the Debtor, (2) the operation of its business, and (3) proposed plan of reorganization, which consists of a sale of the majority of the Debtor's assets. It also discusses the valuation of the Debtor's assets and alternatives to the Plan.

       On February 15, 2007, the Debtor filed a voluntary petition for relief under Title 11, United States Code, known as the Bankruptcy Code (the "Bankruptcy Code"). The Chapter 11 case is pending in the United States Bankruptcy Court for the District of Massachusetts in Springfield, Massachusetts (the "Court"). On

1

February 8, 2008 the Court ordered the appointment of a Chapter 11 Trustee.  On February 13, 2008 Steven Weiss (the "Trustee") was appointed in this case.  A committee of unsecured creditors (the "Creditors' Committee") has been appointed in this case.

Pursuant to § 1125 of the Code, this Plan and Disclosure Statement is being sent to all holders of claims against the Debtor so that the Trustee may solicit votes for the Plan and creditors may be provided with information concerning the Plan, the Debtor and the prospect of future operations. All references herein to the Plan and the Disclosure Statement are as it may be amended from time to time.

**On June 25, 2008 the Bankruptcy Court entered an order pursuant to Bankruptcy Code §105(d) authorizing the Trustee to file a combined Disclosure Statement and Plan of Reorganization, and combining the hearing on approval of disclosure and confirmation of the Plan. Thus, the Court has not approved this Disclosure Statement as containing information of a kind, and in sufficient detail, adequate to enable a hypothetical, reasonable investor, typical of the classes being solicited, to make an informed judgment about the Plan.  The Creditors' Committee supports the Plan.**

**The deadline for objecting to the adequacy of the disclosure statement is AUGUST 28, 2008, and the combined hearing on adequacy of the Disclosure Statement and Confirmation of the Trustee's Plan (the "Hearing") is scheduled for SEPTEMBER 3, 2008 at 11:30 a.m., at the United States Bankruptcy Court, 300 State Street, Springfield, Massachusetts. Any party seeking to file an objection to the adequacy of the disclosure is urged to review Local Bankruptcy Rule 3017-1.**

**THE PLAN IS A LEGALLY BINDING ARRANGEMENT AND SHOULD BE READ IN ITS ENTIRETY. ACCORDINGLY, SOLICITED PARTIES MAY WISH TO**

2

**CONSULT WITH THEIR ATTORNEYS REGARDING THE CONTENTS OF THE PLAN
AND DISCLOSURE STATEMENT.**

B.  <u>Attachments</u>

Accompanying this Disclosure Statement as Exhibit "A" is a
copy of an Asset Purchase Agreement (the "APA") detailing the
terms of the sale of the Debtor's assets to the Purchaser.

Also accompanying this Disclosure Statement and Plan is a
document entitled "Auction Procedures Notice", detailing the
procedures and requirements for any party wishing to submit a
competing offer for the Debtor's Assets, and a ballot for
accepting or rejecting the Plan.

II. <u>THE PLAN</u>

<u>**SUMMARY OF THE PLAN:**</u>

The Trustee has entered into an Asset Purchase Agreement
(the "APA" or the "Agreement") to sell the "Acquired Assets" of
the Debtor (as defined below) to Kenneth, Stephen and John
Sigsbury (collectively, the "Buyer"), for the sum of
$1,500,000.00, to plus assumption of post-petition trade
payables[1]. **The Buyer qualifies as an "insider" as term is defined
in the Bankruptcy Code.**

A summary of the more salient terms[2] include the following:

---

[1] The Asset Purchase Agreement contemplates that the Buyer will
form a new legal entity in which to take title to the Debtor's
assets.

[2] To the extent this summary differs in any way from the
Agreement, the Agreement shall control.

3

| | |
|---|---|
| <u>Seller</u> | Modern Aluminum Anodizing Corporation |
| <u>Buyer</u> | Kenneth, Steven and John Sigsbury or nominee |
| <u>Acquired Assets</u> | All of the Seller's rights, title and interests in the Debtor's real estate, inventory, equipment and accounts receivables; |
| <u>Excluded Assets</u> | Cash held by the Trustee and the Debtor; all estate claims and causes of action under Title 11 or analogous federal and state law. |
| <u>Purchase Price</u> | One million five hundred thousand dollars ($1,500,000.00), <u>plus</u> assumption of post-petition trade payables, including real estate taxes. |
| <u>Deposit</u> | $25,000.00. |
| <u>Closing</u> | Within 21 business days after confirmation of the Plan. |
| <u>Reps and Warranties</u> | Representations and warranties usual and customary for transactions of this nature; the sale of the Acquired Assets is "as is". |
| <u>Court Approval</u> | The Sale is subject to the Court's approval and confirmation of the Plan and competitive bidding pursuant to the Auction Procedures. |
| <u>Other Conditions</u> | Usual and customary, plus: certain approvals from this Court, including the bid protections discussed below; |

In addition, with the filing of this disclosure Statement and Plan, the Trustee is soliciting other bids for the Debtor's assets pursuant to the Auction Procedures, which were approved by the Bankruptcy Court on June 25, 2008.

4

A.   <u>Payment of Administrative Claims</u>.

Administrative Claims will be paid in cash, in full, on the later of the Effective Date or the date they are allowed by an Order of the Bankruptcy Court. Ordinary trade debt incurred by the Debtor in the course of the Chapter 11 case will be paid by the Purchaser an ongoing basis in accordance with the ordinary business practices and terms between the Debtor and its trade creditors. The payments contemplated by the Plan will be conclusively deemed to constitute full satisfaction of Allowed Administrative Claims.

Administrative Claims include any post-petition fees and expenses allowed to professionals employed upon Court authority to render services to the Debtor, the Trustee or the estate during the course of the Chapter 11 case.

In this case, the following professionals were employed: (1) Hendel & Collins, P.C., counsel to the Debtor; (2) Brown Rudnick, LLP, counsel to the Official Unsecured Creditors Committee; (3) Keybridge Associates, as a bookkeeper for the Debtor; (4) Smith Watson & Co., LLP, the Debtor's accountants; (5) Steven Weiss, Chapter 11 Trustee; (6) Shatz, Schwartz and Fentin, P.C., counsel to the Trustee; (7) Andrew Longo, the Trustee's business consultant; and (8) Arthur Grodd, for a "break up fee", so-called.[3] In order to be compensated, all professionals will

---

[3] Prior to receiving the Buyer's offer, the Trustee engaged in serious negotiations to sell the Assets to Mr. Grodd, who made a preliminary offer, which included a request for a "break up fee" in the event that his offer resulted in higher bids. On June 25, 2008 the Bankruptcy Court authorized a breakup fee to Mr. Grodd in the

have to apply to the Court for compensation and they will be paid that amount which the Court allows. It is estimated that administrative fees in the Debtor's case may be approximately $200,000.00, but that is only an estimate by the Trustee and actual fees may be higher than as represented. This Plan and Disclosure Statement was prepared and submitted approximately thirty (30) days prior to the date anticipated for Confirmation and considerably more work by professionals may have been rendered by the time of Confirmation.

B.   Payment of Tax Claims.

Priority Tax Claims, as scheduled or as filed and allowed by the Court, of whatever kind or nature will be paid from the proceeds of the sale. The Massachusetts Department of Revenue ("DOR") has filed a proof of claim in the amount of $4,556.95; the Internal Revenue Service has not filed a claim.

In addition, the Town of North Adams, Massachusetts is owed real estate taxes and other municipal liens in the approximate amount of $40,000.00.   These claims will be assumed by the Buyer.

C.   Designation and Payment of Classes of Claims.

1.   Class One: Claims of T.D. Bank, N.A.

Class One consists of the claims of TD Bank, N.A. (f/k/a TD Banknorth, N.A.) (the "Bank"), a creditor whose claim is secured

---

amount of his fees and expenses, up to $50,000.00.  As the Buyer's offer came *after* this date, and was a direct result of Mr. Grodd's initial offer, the Trustee believes that, subject to consummation of the sale by the Buyer, Mr. Grodd is entitled to his fee (subject to filing an application with the Court).

by liens upon all of the real and personal property owned by the
Debtor, whichever is smaller. At the Petition Date, Bank was
owed approximately $3,252,289.00.  During the course of the
case, the Bank has received payments of $15,000 per month,
pursuant to a series of cash collateral stipulations approved by
the Court.

The Bank's claim will be treated as follows: Upon sale of
the Assets to the Purchaser, the Bank will receive the sum of no
less than $1,225,000.00. The balance of the net sale proceeds,
at least $225,000.00, plus all cash for payment of professional
fees held by the Trustee, that would otherwise be subject to the
Bank's secured claims will be retained by the Trustee made
available by the Bank for payment of allowed claims under this
Plan, pursuant to Bankruptcy Code §506(c).  If a Sale yielding
more proceeds or value is approved and consummated, Bank and the
Debtor's estate will share in net proceeds or value exceeding the
cash portion of that offered by the Purchaser (_i.e._, net proceeds
or value in excess of $1,500,000.00) as follows: Bank shall
receive 75% and the estate shall receive 25%.  The payment shall
be in full satisfaction of all of the Bank's claims against the
Debtor, including its secured claims, its deficiency claim, and
any claim under §507(b) of the Bankruptcy Code shall be deemed
waived by the Bank.  In addition, the Bank shall receive a
complete release from the Debtor and the estate of any claims
that could be asserted against the Bank through the confirmation
of the Plan.

The Class One Claim of the Bank is impaired.

2.   <u>Class Two:  Unsecured Claims</u>.

Class Two consists of all Unsecured Claims, as scheduled or

as filed and allowed by the Court, against the Debtor of whatever kind or nature which are not included in any other Class hereof, including, without limitation, claims based on the rejection of executory contracts or unexpired leases, and claims for damages to person or property based on strict liability, negligence or breach of a warranty, express or implied, relative to services rendered or products delivered by the Debtor. Class 2 and Class 3 creditor claims are approximately $2,000,000.00.

Upon consummation of the sale, the Trustee will hold the minimum sum of $40,000.00, plus funds available after payment of allowed administrative claims, which funds, plus any proceeds of estate causes of action, less expenses for administering the funds, litigating and resolving estate causes of action and objections to claims, and calculating the distributions to holders of Class 2 and Class 3 Claims shall be distributed pro rata among the holders of allowed unsecured claims in Class Two and Class Three (described in more detail below).

The claims of Class Two creditors are impaired.

3.    <u>Class Three: Other Lien Creditors</u>.    There are a number of creditors who obtained involuntary liens (real estate attachments and executions) against the Debtor's real estate. **Class Three consists of ALL creditors whom have involuntary liens upon the Debtor's property, whether or not specifically identified on Exhibit "B".**

The Trustee believes that these liens are wholly undersecured, i.e., that the amount of the Bank's claim exceeds

8

the value of the Debtor's real estate.  As a result, claims of the holders will be deemed to be unsecured claims pursuant to §506 of the Bankruptcy Code, and the transfer of the Debtor's real estate to the Purchaser shall be free and clear of all liens and encumbrances, pursuant to §1123(a)(5) of the Code. The holders of Class Three Claims will be treated as unsecured claims.

Upon consummation of the sale, the Trustee will hold the minimum sum of $40,000.00, plus funds available after payment of allowed administrative claims, which funds, plus any proceeds of estate causes of action, less expenses for administering the funds, litigating and resolving estate causes of action and objections to claims, and calculating the distributions to holders of Class 2 and Class 3 Claims, shall be distributed pro rata among the holders of allowed unsecured claims in Class Two and Class Three.

The claims of Class Three creditors are impaired.

4. <u>Class Four: Equity Interests</u>.  Class Four consists of all Equity Interests, as scheduled or as filed and allowed by the Court, of whatever kind or nature which are not included in any other Class hereof. The Trustee believes that the Debtor's common capital stock has no present value. The stockholders' equity interests will be extinguished on the Effective Date, and will receive nothing on account of those interests.

The claims of Class Four equity interest holders are impaired.

9

D.    <u>Treatment of Executory Contracts and Unexpired Leases.</u>

The Trustee is not aware of any executory contracts to which the Debtor is a party, other than contracts with customers for products. Those contracts will be assumed and performed by the Buyer. All other executory contracts will be rejected.

All proofs of Claim with respect to Claims arising from the rejection of executory contracts or unexpired leases must be filed with the Bankruptcy Court within thirty (30) days from and after the date of entry of an order of the Bankruptcy Court confirming the Plan or such Claims will be barred. A creditor whose claims arise from rejection of executory contracts and unexpired leases will be treated as an unsecured creditor and share pro rata with the holders of Class 3 and Class 4 claims.

III. <u>INFORMATION PERTAINING TO THE DEBTOR</u>

A.    <u>Background Regarding the Debtor.</u>

The Debtor is a Massachusetts corporation which operates an aluminum anodizing facility at 59 Hodges Cross Road, North Adams, Massachusetts. The company employs approximately 45 employees, making it one of the larger employers in the city. The company has been in business since 1971.

B. <u>General Information Regarding The Debtor's Operations</u>.

The Debtor's financial troubles that led to the filing of the Chapter 11 petition were caused by increased energy costs, and by the loss of a major customer, which reduced the company's revenue substantially. Ultimately, one of the Debtor's energy

suppliers threatened to terminate utility service, which compelled the Debtor to file the petition.

The Debtor's fiscal year ends on February 28th. According to the Debtor's Statement of Financial Affairs, sales for the 11 months ending January 31, 2007 were approximately $3,619,235. Sales for the year ending February 28, 2008 (essentially coinciding with the Debtor's first year in Chapter 11) were approximately $3,263,522, which resulted in a loss (after depreciation) of $159,193. During the course of the case, the Debtor, with the assistance of the Trustee and professionals retained by him, has significantly reduced its operating expenses. For example, salaries of the officers and insiders have been reduced by approximately 20 percent, and the company has begun operating at night to reduce energy costs. Sales from March 1, 2008 through June 30, 2008 were in the approximate amount of $957,000.00.

C.   <u>Officers, Directors and Shareholders</u>.

The shareholders of the Debtor are Frank and Beverly Sigsbury, each of whom own 50 percent of the stock in the Debtor. Frank Sigsbury is the Debtor's President. Kenneth Sigsbury is the Debtor's Treasurer and Clerk, and conducts the day to day operations. His present compensation is approximately $53,000.00 per year.

D.   <u>Means for Implementation of the Plan</u>

On Confirmation, all of the Acquired Assets, tangible and intangible, including, without limitation, licenses, furniture, fixtures and equipment, except for the Excluded Assets, will be sold to the Buyer, free and clear of all claims and interests of any kind whatsoever.  The Buyer will assume liability for post-petition Trade Debt (as defined in the APA) and shall indemnify the bankruptcy estate for any claims asserted by the holder of any Trade Debt.

Upon confirmation of the Plan and the consummation of the sale, the Trustee will be appointed as Plan Administrator to: review claims; object to claims if appropriate; prosecute and resolve estate causes of action; administer and liquidate assets; and make distribution to holders of allowed administrative claims and Class 3 and Class 4 claims.

All quarterly disbursement fees, arising under 28 U.S.C. §1930 ("Quarterly Fees"), accrued prior to confirmation shall be paid in full, on or before the date of confirmation of the Debtor's plan, by the Debtor or any successor to the Debtor. All Quarterly Fees which accrue post-confirmation shall be paid in full on a timely basis by the Trustee from the funds of the estate prior to the Debtor's case being closed, converted or dismissed.

Pursuant to § 1146(c) of the Bankruptcy Code, any transfers from the Debtor to any person pursuant to the Plan shall not be subject to any document recording tax, stamp tax, conveyance fee,

intangibles or similar tax, mortgage tax, stamp act, real estate transfer tax, mortgage recording tax or other similar tax or governmental assessment, and the Confirmation Order shall direct the appropriate state or local governmental officials or agents to forego the collection of any such tax or governmental assessment and to accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

E.    The Plan Administrator

a.    Appointment.    From and after the Effective Date, the Trustee will serve as the Plan Administrator of the Debtor. The Plan Administrator will retain all rights and powers conferred by this Plan.    The Plan Administrator shall be deemed appointed as the representative of the Debtor and its estate, pursuant to §1123(b)(3)(B) of the Bankruptcy Code, to pursue estate causes of action and claims for and on behalf of the Debtor and its estate.

b.    Rights, Powers and Duties of Debtor and the Plan Administrator.    The Debtor shall retain and have all the rights, powers and duties necessary to carry out its responsibilities under the Plan.    Such rights, powers and duties, which shall be exercisable by the Plan Administrator on behalf of the Debtor and the Estate pursuant to the Plan shall include, among others:

(1)    exercising all power and authority that may be exercised, and take all proceedings and acts that may be taken, by any officer, director or shareholder of the Debtor;

(2)    investing the Estate's Cash, including, but not limited to, the Cash held in the Reserves in (A) direct obligations of the United States of America or obligations of any agency or instrumentality thereof that are backed by the full faith and credit of the United States of America,

13

including funds consisting solely or predominantly of such securities; (B) money market deposit accounts, checking accounts, savings accounts or certificates of deposit, or other time deposit accounts that are issued by a commercial bank or savings institution organized under the laws of the United States of America or any state thereof; or (C) any other investments that may be permissible under (I) the Bankruptcy Code or (II) any order of the Bankruptcy Court entered in the Debtor's Chapter 11 case;

(3) calculating and paying all distributions required or permitted under the Plan and other orders of the Bankruptcy Court;

(4) employing, supervising and compensating professionals retained to represent the interests of and serve on behalf of the Debtor and the Estate;

(5) establishing, maintaining and funding Reserves, accounts and escrows with amounts of the Estate's Cash, in the Plan Administrator's discretion, that are sufficient to fund the expenses and Claims for which such Reserves, accounts and escrows were established;

(6) making and filing tax returns for the Debtor;

(7) objecting to or seeking to subordinate Claims or Interests filed against the Debtor's Estate on any basis in consultation with the Plan Committee;

(8) seeking estimation of contingent or unliquidated claims under §502(c) of the Bankruptcy Code;

(9) seeking determination of tax liability under § 505 of the Bankruptcy Code;

(10) prosecuting turnover actions under §§ 542 and 543 of the Bankruptcy Code;

(11) prosecuting, settling, dismissing or otherwise disposing of the Retained Actions;

(12) closing the Chapter 11 Case;

(13) exercising all powers and rights, and taking all actions, contemplated by or provided for in the Plan; and

14

(14) taking any and all other actions necessary or appropriate to implement or consummate the Plan.

The Plan Administrator will be responsible for timely payment of fees incurred pursuant to 28 U.S.C. §1930(a)(6) from funds in the estate. After confirmation, the Plan Administrator will serve the United States Trustee with a monthly financial report for each month (or portion thereto) the case remains open.  the monthly financial report shall include the following:

      (a)  A statement of all disbursements made during the course of the month, whether or not pursuant to the Plan;

      (b)  A summary, by class, of amounts distributed or property transferred to each recipient under the Plan, and an explanation of the failure to make any distributions or transfers of property the Plan;

      (c)  The Plan Administrator's projections as to its continuing ability to comply with the terms of the Plan;

      (d)  A description of any other factors which may materially affect the Plan Administrator's ability to consummate the Plan; and

      (e)  An estimated date when an application for final decree will be filed with the Court (in the case of the final monthly report, the date on which the decree was filed).

F.  <u>Compensation of the Plan Administrator.</u>  The Plan Administrator shall be compensated from the Operating Reserve. Any Administrator Professionals retained by the Plan Administrator shall be entitled to reasonable compensation for services rendered and reimbursement of reasonable expenses incurred from the Operating Reserve.  Such Professionals shall

provide invoices to the Plan Administrator for payment, with copies to the United States Trustee.  If no objection is made to the Plan Administrator within ten days, the Plan Administrator shall pay the submitted invoice.  If objection is made, the invoice shall be held until the objection has been resolved between the parties.  If no resolution can be reached within a reasonable time and the Case is still open, the matter may be submitted to the Bankruptcy Court for determination.  After the Case has been closed, either the Professional or the objecting party or the Plan Administrator can request that the matter be submitted to mediation (if all parties agree) or binding arbitration pursuant to the then promulgated rules of procedure issued by JAMS, the costs of such procedure being paid from the Operating Reserve.

G.  <u>Indemnification.</u>  The Debtor and the Estate shall indemnify and hold harmless (i) the Plan Administrator and (ii) the Administrator Professionals (collectively, the "Indemnified Parties"), from and against and with respect to any and all liabilities, losses, damages, claims, costs and expenses, including but not limited to reasonable attorneys' fees arising out of or due to their actions or omissions, or consequences of such actions or omissions, other than acts or omissions resulting from such Indemnified Party's willful misconduct or gross negligence, with respect to the Debtor, the Estate or the implementation or administration of the Plan.  To the extent an Indemnified Party asserts a claim for indemnification as provided above, the reasonable legal fees and related costs incurred by counsel to the Plan Administrator in monitoring and participating in the defense of such claims giving rise to the asserted right of indemnification shall be advanced to such Indemnified Party out of the Operating Reserve.  The indemnification provisions of the Plan Administrator Agreement shall remain available to and be

16

binding upon any former Plan Administrator or the estate of any decedent Plan Administrator and shall survive the termination of the Plan Administrator Agreement.

H.  <u>Insurance.</u> The Plan Administrator shall be authorized to obtain and pay for out of the Operating Reserve all reasonably necessary insurance coverage for itself, its agents, representatives, employees or independent contractors, and the Debtor, including, but not limited to, coverage with respect to (i) any property that is or may in the future become the property of the Estate and (ii) the liabilities, duties and obligations of the Plan Administrator and its agents, representatives, employees or independent contractors under the Plan Administrator Agreement (in the form of an errors and omissions policy or otherwise).

The Plan Administrator shall obtain a bond in favor of the Estate in an amount satisfactory to the United States Trustee.

I.  <u>Successor-in-Interest.</u> The Estate shall be the successor-in-interest to (and assignee of) any and all Causes of Action, rights, claims or defenses, including objections to Claims and Interests, or proceedings to subordinate or recharacterize Claims and Interests that the Debtor or a committee of creditors appointed pursuant to 11 U.S.C. § 1102 would be entitled to prosecute.

Authority to Object to Claims and Interests and to Settle Disputed Claims.  From and after the Effective Date, the Debtor and the Plan Administrator shall be authorized, with respect to those Claims or Interests which are not Allowed hereunder or by Court order, (i) to object to any Claims or Interests Filed against any of the Debtor's Estate and (ii) to compromise and settle Disputed Claims after the Effective Date, and such compromise or settlement shall not be subject to the approval of

17

the Bankruptcy Court.

J.   Provision for Disputed Claims:

The Debtor or the Plan Administrator may object to the allowance of any Claims within 90 days of the Effective Date by filing an objection with the Bankruptcy Court and serving a copy thereof on the holder of the Claim in which event the Claim objected to will be treated as a Disputed Claim under the Plan. If and when a Disputed Claim is finally resolved by allowance of the Claim in whole or in part, the Trustee will make any payments in respect of such Allowed Claim in accordance with the Plan.

K.   Administrative Claims:   All parties seeking payment for Chapter 11 administrative expenses and all professionals seeking compensation of Chapter 11 administrative fees must file their claims, or applications for compensation, respectively, within **45 days** after the entry of the Confirmation Order.

L.   Exculpation and Limitation of Liability:

Except as otherwise specifically provided in this Plan, the Debtor, the Trustee, the Plan Administrator, the Creditors' Committee, the members of the Creditors' Committee in their capacities as such, and any of such parties' respective present or former members, officers, directors, employees, advisors, attorneys, representatives, financial advisors, investment bankers, or agents and any of such parties' successors and assigns, shall not have or incur any claim, obligation, Cause of Action, or liability to one another or to any Claimholder or

18

Interest holder, or any other party in interest, or any of their respective agents, employees, representatives, financial advisors, attorneys or Affiliates, or any of their successors or assigns, for any act or omission originating or occurring prior to the Effective Date of this Plan in connection with, relating to, or arising out of the Debtor, the Debtor's Chapter 11 Case, the negotiation and filing of the Plan or any prior plans of reorganization, filing the Chapter 11 Case, the pursuit of confirmation of the Plan or any prior plans of reorganization, the Sale Order, the consummation of the Plan, the administration of the Plan or the property to be distributed under the Plan, except for their willful misconduct as determined by a Final Order of a court of competent jurisdiction, and in all respects shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities under the Plan.

IV. <u>VOTING AND CONFIRMATION</u>

A.   <u>General Requirements:</u>   In order to confirm a Plan, the Code requires that the Bankruptcy Court make a series of determinations concerning the Plan, including that: (1) the Plan has classified Claims in a permissible manner; (2) the Plan complies with the technical requirements of Chapter 11 of the Code; (3) the proponent of the Plan has proposed the Plan in good faith; (4) the disclosures concerning the Plan as required by Chapter 11 of the Code have been adequate and have included information concerning all payments made or promised by the Debtor in connection with the Plan; (5) the Plan has been accepted by the requisite vote of creditors, except, as explained below, to the extent that "cram-down" is available under §1129(b) of the Code; (6) the Plan is "feasible" (that is,

there is a reasonable prospect that the Debtor will be able to perform its obligations under the Plan and continue to operate its business without further financial reorganization, except if the Plan contemplates a liquidation of the Debtor's assets); and (7) the Plan is in the "best interests" of all creditors (that is, that creditors will receive at least as much under the Plan as they would receive in a Chapter 7 liquidation). To confirm the Plan, the Bankruptcy Court must find that all of these conditions are met. Thus, even if the creditors of the Debtor accept the Plan by the requisite number of votes, the Bankruptcy Court must make independent findings respecting the Plan's feasibility and whether it is in the best interests of the Debtor's creditors before it may confirm the Plan. The Trustee believes that the Plan fulfills all of the statutory conditions of §1129 of the Code. The statutory conditions to confirmation are more fully discussed immediately below.

B.    Classification of Claims and Interests

The Code requires that a plan of reorganization place each creditor's claim in a class with other claims which are "substantially similar."  The Trustee believes that the Plan meets the classification requirements of the Code.

C.  Voting

As a condition to Confirmation, the Code requires that each impaired class of claims accept the Plan. The Code defines acceptance of a Plan by a class of claims as acceptance by holders of two-thirds in dollar amount and a majority in number of claims of that class, but for that purpose the only ballots

counted are those of the creditors who are allowed to vote and who actually vote to accept or to reject the Plan. Persons who are considered "insiders," as that term is defined in §101 of the Code, may vote, but their votes are not counted in determining acceptance of the Plan.

Classes of claims that are not "impaired" under the Plan are deemed to have accepted the Plan. Acceptances of the Plan are being solicited only from those persons who hold Allowed Secured and Unsecured Claims that are impaired under the Plan. An Allowed Claim is "impaired" if the legal, equitable, or contractual rights attaching to the Allowed Claims of the class are modified, other than by curing defaults and reinstating maturity or by payment in full in cash. A claim to which an objection is filed is not an Allowed Claim. However, the Court may allow such a claim for purposes of voting on the Plan. If you have not received an objection to your claim prior to Confirmation of the Plan and you have received a ballot for purposes of voting on the Plan, then most likely your claim is an Allowed Claim. If you have a question, you should consult your own attorney.

D.   Best Interests of Creditors

Notwithstanding acceptance of the Plan by creditors of each class, in order to confirm the Plan the Bankruptcy Court must independently determine that the Plan is in the best interests of all classes of creditors impaired by the Plan. The "best interests" test requires that the Bankruptcy Court find that the Plan provides to each member of each impaired class of claims a recovery which has a value at least equal to the value of the distribution which each such creditor would receive if the Debtor was liquidated under Chapter 7 of the Code. Please see the discussion of liquidation value below.

E.   Confirmation Without Acceptance by All Impaired Classes

Even if a plan is not accepted by all impaired classes, it may still be confirmed. The Code contains provisions for confirmation of a plan where at least one impaired class of claims has accepted it. These "cramdown" provisions are set forth in §1129(b) of the Code.

A plan of reorganization may be confirmed under the cramdown provisions if, in addition to satisfying the usual requirements of §1129 of the Code, it (i) "does not discriminate unfairly" and (ii) "is fair and equitable," with respect to each class of claims that is impaired under, and has not accepted, the plan. As used by the Code, the phrases "discriminate unfairly" and "fair and equitable" have narrow and specific meanings unique to bankruptcy law.

The requirement that a plan of reorganization not "discriminate unfairly" means that a dissenting class must be treated equally with respect to other classes of equal rank. The Trustee believes that his Plan does not "discriminate unfairly" with respect to any class of Claims.

The "fair and equitable" standard differs according to the type of claim to which it is applied. In the case of secured creditors, the standard is met if the secured creditor retains its lien and is paid the present value of its interest in the property which secures the secured creditor's claim. With respect to unsecured creditors, the standard is met if the unsecured creditor receives payment in the full amount of its claim or, in the event that it receives less than the full amount of its claim, no junior class receives or retains any interest in property of the debtor. The standard as applicable to unsecured creditors is also known as the "absolute priority rule."[4]

V.    LIQUIDATION VALUATION

To calculate what creditors would receive if the Debtor was to be liquidated, the Bankruptcy Court must first determine the aggregate dollar amount that would be generated from the Debtor's assets if the Chapter 11 case were converted to a Chapter 7 case under the Code and the assets were liquidated by a trustee in bankruptcy (the "Liquidation Value"). The

---

[4]    In these cases unsecured creditors are not being paid in full. The Trustee anticipates that the Plan will be accepted by the class of unsecured creditors thereby obviating any requirement to "cram down" unsecured creditors.

Liquidation Value would consist of the net proceeds from the disposition of the assets of the Debtor augmented by the cash held by the Debtor.

The Liquidation Value available to general creditors would be reduced by (a) the claims of secured creditors to the extent of the value of its collateral, and (b) by the costs and expenses of the liquidation, as well as other administrative expenses of the Debtor's estates. The  costs of liquidation under Chapter 7 would include the compensation of the trustee, as well as of counsel and of other professionals retained by the trustee; disposition expenses; all unpaid expenses incurred by Debtor during the Chapter 11 case (such as compensation for attorneys) which are allowed in the Chapter 7 proceeding; litigation costs; and claims arising from the operation of the Debtor's business during the pendency of the Chapter 11 reorganization and Chapter 7 liquidation cases.

Moreover, in this case, because the Debtor's facility has substantial chemicals used in the anodizing process, there would likely be substantial "shutdown" expenses incurred by the Trustee (if he were to liquidate the Debtor's assets) or by the Bank (if the Trustee were to abandon the Debtor's property). The facilities would have to be shut down in an orderly fashion, consistent with applicable environmental and safety regulations.

Once the percentage recoveries in liquidation of secured creditors, priority claimants, general creditors and equity security holders are ascertained, the value of the distribution

24

available out of the Liquidation Value is compared with the value of the property offered to each of the classes of Claims under the Plan to determine if the Plan is in the best interests of each creditor and equity security holder.

The Trustee has not commissioned appraisals of the Debtor's assets.  However, TD Banknorth obtained appraisals which have been provided to the Trustee.  An appraisal of the equipment dated April 1, 2005 ascribes an "auction value" of $400,000 to $450,000.00; an appraisal of the real estate dated April 10, 2007 ascribes a fair market value of $1,325,000.00 for the real estate.

The Trustee believes that the proper measure of valuation for liquidation of the Debtor's business is the auction method. Were the Debtor's assets to be liquidated, and were the Bank not to agree to a "carve out" to pay a dividend to unsecured creditors, there would be no proceeds available for unsecured claims.

Indeed, even on a "going concern" basis, the value of the Debtor's assets is substantially less than the Bank's secured claim.  During his administration of the case, the Trustee has marketed the Debtor's assets for sale.  Prior to accepting the Buyer's offer, the Trustee had received another serious offer from Arthur Grodd, which resulted in the Buyer's offer. However, both of those offers for the Debtor's assets on a "going concern" basis, even under competitive circumstances, have not resulted in an offer higher than the Bank's claims.

The following table suggests a likely liquidation scenario for the Debtor:

Liquidation of Real Estate:   $1,000,000[5]

Liquidation of Equipment:        400,000

Liquidation of Acc Receivable:   300,000[6]

TD Bank Secured Claim:         $3,200,000

Funds available for estate:        0.00

        \*   \*   \*   \*   \*   \*

Funds held by Trustee:            35,000

Chapter 11 Admin. Claims:        $200,000

Unsecured claims:              $4,000,000[7]

Net available for
unsecured creditors:              <u>Zero</u>

The Trustee estimates that the Debtor's unsecured creditors would receive no dividend in liquidation, while the Plan provides for at least a minimal dividend.  The Trustee believes that the Plan is in the best interests of all creditors.  Thus, a

---

[5] This represents approximately 75 percent of appraised value.

[6] Based upon 67 percent of estimated $450,000.00 total accounts.

[7] In addition to Class 3 and 4 claims, the Trustee estimates that

conversion to Chapter 7 with the additional costs noted above would provide less of a return to the creditors.

## VI. FEDERAL INCOME TAX CONSEQUENCES

Implementation of the Plan may result in federal income tax consequences to holders of Allowed Claims. Tax consequences to a particular creditor may depend on the particular circumstances or facts regarding the claim of the creditor. **No tax opinion has been sought or will be obtained with respect to any tax consequences of the Plan, and the following disclosure (the "Tax Disclosure") does not constitute and is not intended to constitute either a tax opinion or tax advice to any Person. Rather, the Tax Disclosure is provided for informational purposes only.**

Because the Debtor will not continue its existence and business operations, it will not receive a discharge with respect to its outstanding indebtedness. Pursuant to information provided by the Debtor's accountants, the depreciated book values of the Debtor's assets are as follows: real estate and improvements: $1,837,230; equipment: $2,081,996; furniture: $1,649; vehicles: $33,489. In addition, the Debtor has cumulative net operating losses of $2,403,522. As the sale of the Debtor's assets is for considerably less than the net book value of the assets, the Trustee does not believe that there will be any taxes due upon the sale.

---

Banknorth would have a deficiency claim of approximately $2,000,000.

The federal tax consequences of the plan to a hypothetical investor typical of the holders of claims or interests in this case depend to a large degree on the accounting method adopted by that hypothetical investor. A "hypothetical investor" in this case is defined as a general unsecured creditor. In accordance with federal tax law, a holder of such a claim that uses the accrual method and who has posted its original sale to the Debtor as income at the time of the product sold or the service provided hypothetically should adjust any net operating loss to reflect the dividend paid by the Debtor under the Plan provided that holder previously deducted the liability to the Debtor as a "bad debt" for federal income tax purposes. Should that holder lack a net operating loss, then in accordance with federal income tax provisions, the holder should treat the dividend paid as ordinary income, again provided the holder previously deducted the liability to the debtor as a "bad debt" for federal income tax purposes. If the accrual basis holder of the claim did not deduct the liability as a "bad debt" for federal income tax purposes, then the dividend paid by the Debtor has no current income tax implication. A holder of a claim that uses a cash method of accounting would, in accordance with federal income tax laws, treat the dividend as income at the time of receipt.

**THE TRUSTEE MAKES NO REPRESENTATIONS REGARDING THE PARTICULAR TAX CONSEQUENCES OF CONFIRMATION AND CONSUMMATION OF THE PLAN AS TO ANY CREDITOR. EACH PARTY AFFECTED BY THE PLAN SHOULD CONSULT HER, HIS OR ITS OWN TAX ADVISORS REGARDING THE**

**SPECIFIC TAX CONSEQUENCES OF THE PLAN WITH RESPECT TO A CLAIM.**

VII.  <u>FEASIBILITY</u>

The Bankruptcy Code requires as a condition to Confirmation that the Bankruptcy Court find that liquidation of the Debtor or the need for further reorganization is not likely to follow after Confirmation. The Buyer has provided evidence satisfactory to the Trustee that it will be able to consummate the acquisition of the Debtor's assets.  This will create the pool of funds necessary to consummate the Plan.

VIII. <u>DISCLAIMERS</u>

**THE CONTENT OF THIS DISCLOSURE STATEMENT <u>HAVE NOT YET BEEN</u> <u>APPROVED BY THE BANKRUPTCY COURT AS PROVIDING ADEQUATE</u> <u>INFORMATION TO CREDITORS</u> SO THAT THEY MAY HAVE SUFFICIENT INFORMATION TO VOTE ON THE PLAN.  NO REPRESENTATIONS CONCERNING THE DEBTOR, INCLUDING THOSE RELATING TO ITS FUTURE BUSINESS OPERATIONS, OR THE VALUE OF ITS ASSETS, ANY PROPERTY, AND CREDITORS' CLAIMS, INCONSISTENT WITH ANYTHING CONTAINED HEREIN HAVE BEEN AUTHORIZED. THE TRUSTEE DOES NOT WARRANT OR REPRESENT THAT THE INFORMATION CONTAINED HEREIN IS COMPLETE OR WITHOUT OMISSIONS.  THE BANKRUPTCY COURT'S APPROVAL OF THIS PLAN OF REORGANIZATION AND DISCLOSURE STATEMENT DOES NOT CONSTITUTE A RECOMMENDATION FOR OR AGAINST THE PLAN.**

**THIS DISCLOSURE STATEMENT MAY NOT BE RELIED UPON FOR ANY PURPOSE OTHER THAN TO DETERMINE HOW TO VOTE ON THE PLAN, AND NOTHING CONTAINED IN IT WILL CONSTITUTE AN ADMISSION OF ANY FACT OR LIABILITY BY ANY PARTY, OR BE ADMISSIBLE IN ANY PROCEEDING**

**INVOLVING THE DEBTOR OR ANY OTHER PARTY, OR BE DEEMED CONCLUSIVE ADVICE ON THE TAX OR OTHER LEGAL EFFECTS OF THE REORGANIZATION ON HOLDERS OF CLAIMS.**

**THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE AS OF THIS DATE UNLESS ANOTHER TIME IS SPECIFIED, AND NEITHER DELIVERY OF THIS DISCLOSURE STATEMENT NOR ANY EXCHANGE OF RIGHTS MADE IN CONNECTION WITH THIS DISCLOSURE STATEMENT WILL, UNDER ANY CIRCUMSTANCES, CREATE AN IMPLICATION THAT THERE HAS BEEN NO CHANGE IN THE FACTS SINCE THE DATE OF THE DISCLOSURE STATEMENT AND THE MATERIALS RELIED UPON IN PREPARATION OF THIS DISCLOSURE STATEMENT WAS COMPILED.**

IX.    EFFECT OF THE ORDER CONFIRMING THE PLAN.

To understand the full effect of an order confirming the Plan you should read §1141 of the Code. The following is a summary of that section.

A. The provisions of the confirmed Plan bind the Debtor, any entity issuing securities under the plan, any entity acquiring property under the Plan, and any creditor, equity security holder, or general partner in the debtor, whether or not the claim or interest of such creditor, equity security holder, or general partner is impaired under the Plan and whether or not such creditor, equity security holder, or general partner has accepted the Plan.

B. Except as otherwise provided in the Plan or the order confirming the Plan, the confirmation of the Plan vests all of

the property of the estate in the Debtor.

C. Except as otherwise provided in the Plan or in the order confirming the Plan, after confirmation of the Plan, the property dealt with by the Plan is free and clear of all claims and interests of creditors, equity security holders, and of general partners in the Debtor.

D. Except as otherwise provided in the Plan, or in the order confirming the plan, the confirmation of the Plan discharges the debtor from any debt that arose before the date of such confirmation. There may be other exceptions set forth in §1141.

E. The confirmation of the Plan does not discharge a debtor if the Plan provides for the liquidation of all or substantially all of the property of the estate, the Debtor does not engage in business after consummation of the plan; and the Debtor would be denied a discharge if the case were a case under chapter 7.

X. <u>CONCLUSION</u>

The Trustee believes that this Plan and Disclosure
Statement contains information sufficient for holders of Claims
to make an informed judgment in exercising their right to vote
on the Plan. The Plan is the result of an effort by the Trustee
and the Committee to provide creditors with a meaningful
dividend. An alternative to the Plan is liquidation which will,
in all likelihood, produce no return to creditors on their
Allowed Claims. Moreover, the Plan provides a means by which the
Debtor's operations can continue, which will save employees'
jobs, and will enable creditors to continue to do business with
the Debtor's successor in the future.  The Trustee believes that
the Plan is clearly preferable to liquidation.

**A BALLOT IS ENCLOSED WITH THIS DISCLOSURE STATEMENT. YOU SHOULD VOTE TO ACCEPT OR REJECT THE PLAN ON THAT BALLOT AND RETURN IT AS FOLLOWS: BALLOTS SHOULD BE SENT TO: Steven Weiss, Chapter 11 Trustee, c/o Shatz, Schwartz and Fentin, P.C. 1441 Main Street, Springfield, MA 01103.**

**ALL BALLOTS MUST BE RECEIVED BY THE TRUSTEE BY AUGUST 28, 2008 at 4:30 p.m. IN ORDER TO BE COUNTED.**

Respectfully submitted this 28th day of July, 2008.

STEVEN WEISS, TRUSTEE

By: /s/ Steven Weiss, Esq.
Steven Weiss, Esquire
BBO# 545619
Shatz, Schwartz and Fentin, P.C.
1441 Main Street, Suite 1100
Springfield, MA  01103
(413) 737-1131
(413) 736-0375 (fax)
sweiss@ssfpc.com

08\0092\Plan of Reorganization\Combine. D.Stmt.Plan.7.28.08